Yes, thank you Judge Gould. Good morning. May I please the court, Artem Sirayr for Mr. Lalayan. I will argue for eight minutes and I will hold my two minutes for a rebuttal. This is a case that turns on credibility. Even though there was an alternative finding, but even alternative finding turned on credibility. So I'm going to start with credibility. Immigration judge found my client, Mr. Lalayan, not credible, cited three specific reasons. However, before immigration judge went in those three specific reasons, immigration judge stated that his account of persecution was credible and consistent. Then the immigration judge said three reasons why she finds him not credible. And under Real ID Act, she invoked, and the case is under Real ID Act, she invoked, you know, cite reasons for that. Reason number one, my client, so the background of the case is this. American charitable organization in New York, UMCOR, opens up a branch in Armenia to distribute humanitarian aid. That local branch of UMCOR hires number of other local organizations to distribute such aid. One of the organization is the Union of Volunteers, we're going to call it a union. So my client is also a member of the union as a volunteer and a war veteran. The union distributes aids to the families of fallen soldiers. For a number of years, my client worked for UMCOR and also was a member of union. In 2014, he became a deputy chief on one district for the union. At the same time, could I suggest that you go to your argument about what was wrong with the IJ opinion, because we have read the briefs, do we know the facts? Yes, absolutely. So first reason, judge says, you filed a complaint with the government of Armenia, the prosecutor's office of embezzlement and theft by the union, yet you failed to file a complaint with UMCOR New York office. Now, judge blames my client for a simple reason that he obtained letter of recommendation from the local Armenian branch of UMCOR, which was in English, but yet he did not complain about embezzlement to the New York office of UMCOR in New York. My client clearly explained, he was not good with the computers, and he did not know the language. Judge found that incredible, because he got the letter from the local office, which ran by local population, local Armenians, which was written in English, and he did not file a complaint with UMCOR. There was another explanation. He specifically said that when he went to the government of Armenia to file a complaint about embezzlement by the union, he acted as a deputy chief of the union. He did not act as UMCOR member, and that's specifically on administrative record 198. He stated the following, I did that in the capacity of a deputy chief of the union and not as UMCOR employee. So that in itself, he explained why he didn't want to, first of all, he couldn't file a complaint with New York, because he did not have computer skills, nor did he speak English. Second, he explained he was acting as a deputy chief of the union, and he filed a complaint with the Armenian government against the union. And finally, he also said and explained that he was afraid that if this gets to the UMCOR, UMCOR will stop the humanitarian aid to the fallen soldiers. He did not want that to be happening. So that was the reasoning for the judge's negative credibility, the very first reasoning, and I believe it's not correct. The second reason that judge said is she did not believe the way he discovered the embezzlement. His testimony was very clear. He worked originally as a driver, then promoted to the chief driver, eventually as a warehouse agent. Right before he got his new job in Mexico, he started turning over all documentation. By that time, he was a deputy at the union, and he was able to request additional documents from the union as a deputy. Before he was just a regular member, he couldn't get it. So he requested additional documents to match the distribution before he turns over his duties. Now, he also testified that over 1,000 organizations, that's AR-192, over 1,000 organizations distributed humanitarian aid in Armenia, and one of those organizations was the union of which he was a deputy chief. He was able to get the documents as a deputy chief to match with what his records are. Prior, he wasn't. He was just a regular member. Well, judge said, listen, you've been there for seven years, you should have seen these records, and therefore you're not credible. That's another reason why she said he wasn't credible. And finally, the most importantly, government presented evidence that my client was trying to get visa to United States on four occasions in 2007, 2013, 2015, 2009. Now, the testimony of his spouse was that her entire family is in United States. In 2007, they were getting married. They wanted to come for a honeymoon. They were declined. There was her father who was ill. Eventually, he passed. Wife's testimony was as follows. We wanted to come to United States, visit my father's grave, then travel to Mexico. This coincided with November 4th assault, arrest, and beating of my client. They went to U.S. Embassy on November 2nd. So on November 2nd, before anything happened, their plan is they have a job offer to work in Mexico for a year. Their plan is we're traveling for such a long distance. We're going to go to America, go to my father's Mexico, and work. By that time, he files the complaint. Two days later, he's accosted. He's beaten. He's threatened with a knife. He's threatened with the killing of his entire family. And that timing was the reason for the judge's decision that he wasn't credible. On the incidents and all the persecution, immigration judge found that he was consistent and credible. It's just the timing of the events, this explanation for not filing a complaint with the New York branch, that was contributed to the judge's opinion. And most of it was basically based on speculation. For example, she said it was incredible that he wouldn't consult with his wife as to travel plans because they were married for so many years. But it's a judge's speculation based on the family dynamics. You know, in one country, family dynamic is different than the family dynamic in the United States, for example. So our court has said that when an IJ finds something implausible, it's not okay to rely on speculation and conjecture. But it is okay to rely on common sense. Do you have any advice for how we should decide which is which? Absolutely. And the board and the court reemphasized that we are allowed to use common sense. Here, the common sense says the petitioner, Mr. Lalayan, complains to the government of Armenia about his organization in which he's a volunteer and deputy, which is the union. He wasn't complaining about OMCOR. He wasn't going to tell anything to OMCOR. He's complaining about his organization in which he's a member that... But it seems like the IJ maybe thought this just doesn't make sense as common sense. So if that's what the IJ thought, can we say, well, it doesn't seem so implausible to us? I mean, how do we deal with it if the IJ just sort of, from the IJ's common sense perspective, thought this wasn't plausible? Well, IJ's common sense perspective was based on IJ's speculation, what IJ was thinking the petitioner in this case should have done, on how the petitioner should have thought. Because she is pretty much looking at her perspective and thinking this is how the petitioner should act. And that's a pure speculation. Counsel, if I could interject a question. The main concern I have with the petitioner's case is that an IJ can properly consider under the Real ID Act. And that among those things are things like inconsistencies, but also demeanor, and also responsiveness. So the thing that worries me about the claim here, whether we could grant or not, is that the IJ, or the board, wait, put that one back. The board specifically said, as part of its opinion, that, quote, we defer to the IJ's demeanor observation. Given the IJ's unique position of witnessing the testimony of the alien during the hearing, then turn the page. And then also, in the IJ decision, the IJ commented, among other things, about the respondents, which hear the petitioner's wife's vagueness and evasiveness and implausible statement. So when the immigration judge thinks the wife is being vague and evasive, and when the board is deferring to what the IJ said, then how can we find that their credibility determination? If I may respond. So the demeanor determination by immigration judge, which the board affirmed, were only related to the female petitioner's testimony as related to the travel plans. Now, Shrestha says specifically, it's totality of circumstances and all relevant factors. Female petitioner, in this case, stated that she was not informed of all the plans and plans for changing as they were traveling. The primary petitioner, a male in this case, was making a decision as to where to take the family. And that's why the female petitioner wasn't able to explain exactly at what point in time they decided to travel to Mexico, what point in time they decided to change their ways. Her demeanor was at that specific junction as to how they plan to travel, when they plan to travel, when they change their travel plan. That was the demeanor that the immigration judge cited. It wasn't demeanor of lead petitioner as to the persecution. It wasn't demeanor of the lead petitioner as to respondents' demeanor related to as to when plans to travel to Mexico versus the United States have changed. So can I just ask, was it demeanor at all? So I had understood demeanor in Shrestha to be, is the person fidgeting? Are they sweating? Is their face turning red? Things that you can look about, about how they are acting as they testify. But I didn't understand this to be, he looks like his eyes are darting around. He looks like he's nervous, or she looks like she's nervous. It was more what she said didn't make sense to me. And we can read what she said. So I'm not sure you, I'm, do you think that is demeanor? Oh, well, judge added a demeanor to make her negative credibility findings stronger. But did the IJ or did the BIA only do that? Well, the IJ recited the judge's decision for words, word for word, and then added another reason to deny, which wasn't in the original IJ's decision. It was only the BIA that said demeanor, right? Right. Which I don't agree with that from my reading of the record. What I, so I'll give counsel a chance to respond. What I made a note of was that the IJ specific, specifically commented about the wife's vagueness, evasiveness, and implausible statement. And vagueness and evasiveness seem to me to be credibility, demeanor type observations. Witness doesn't answer or evades a question. Why don't those, those words vagueness and evasiveness put the case into the realm of demeanor? Because it's not her demeanor, it's rather lack of information to which she admitted she did not know, did not know exact plans. Judge replied that it's unlikely she would not have been aware of such plans. But again, judge puts her perspective and her speculation that in that family dynamics, wives should have known what exactly they're going to do. Hey, thanks, counsel. Well, I've got you with my questions. I put you four and a half minutes over your time, and yet I'm going to give you two or three minutes for rebuttal after the government speaks. So is Mr. Mr. Sarjan, is that, can we conclude your initial presentation now? Yes, Your Honor, if I could have just a minute for rebuttal after that, that would be great. Yeah, we'll give you so you can plan. We'll give you three minutes for rebuttal. Thank you very much. Then we'll turn to Mr. Tucker. Thank you. May it please the court, Colin Tucker for the Attorney General. The adverse credibility determination here is supported by several implausibilities, the most apparent of which is petitioners claim that he did not learn of the alleged embezzlement that began the chain of events until November of 2015. The petitioner testified, and I want to be clear on this, he testified that from 2008 to 2015, he was in charge of the warehouse. He was responsible for a comprehensive accounting of distribution of goods from the warehouse and that he was known for being diligent in his work. That being the case, it is implausible that for seven years, he never so much as attempted to confirm that the goods being distributed from the warehouse were actually making its way to their intended recipients. That's not a determination of how he looked while he was testifying or how he sounded while he was testifying. It's a determination of the logic of his story. Right. And what if we what do we do if we disagree with the logic, logical conclusion that the IJ drew about that? Your Honor, I think that this is a case where the standard of review should carry the day. The court can disagree with the immigration judge's determination on that point while still acknowledging that any reasonable fact finder would not be compelled to disagree. And I think that's the important distinction here. Now, with respect to demeanor, I the government's view of the case is that the respondent's wife's demeanor undermined her credibility, but that there is no demeanor based finding for the respondents or the petitioner himself. Excuse me. And where aren't the criticisms of the wife's testimony also about the plausibility and logic and whether a wife might really not know her husband's planning rather than anything about her fidgeting or her eyes darting or her sweating or something that you would observe only in the courtroom? Sure. Your Honor, we addressed the demeanor finding for the wife at page I believe it's twenty nine of the brief. And I agree with Judge Gould that the references to her vagueness and her evasiveness are primarily what supports treating the adverse credibility determination for her as one that relates to her demeanor. Is there anything about the IJ's reasoning on the wife's testimony that would only have been observable in the courtroom? Your Honor, the IJ seems to rely mainly on the vagueness of the answers, answers such as probably I can't say probably in November we were in Moscow. So whenever that happened, just I think he looked to her general inability to provide details on the on the points and at times seemed lack of interest in providing those details. But I don't know that he pointed to any specific physical actions on her part that support the demeanor finding. And so couldn't we just read those answers and think ourselves about whether this might be the kind of answer that a woman in a not very egalitarian relationship might give in after a crisis where things were happening quickly? Again, Your Honor, I believe that you could reach that conclusion based on this evidence. I also believe you could reach the conclusion that this is someone who is relating events that may not have actually happened to them. And that that's the conclusion the agency reached here where the evidence supports both conclusions. It survives review. The finding survives review for substantial evidence. There were other implausibilities that supported the adverse credibility determination. The second petitioner's testimony that he reported discrepant records directly to the Armenian law enforcement and not to his employer. The explanations that were provided for that implausibility are equally problematic. He stated first, and this is something my colleague didn't mention, that he was afraid U.N. Corps would stop operating in Armenia if they knew, although he's never explained how going only to law enforcement would have prevented U.N. Corps from finding out if he expected an investigation to follow. He's also pointed to a language barrier and a lack of computer literacy. But again, the record shows he was capable of communicating with his superiors at U.N. Corps in the form of the recommendation letter. Finally, he suggested simply that the recommendation letter wasn't written by him. Right. He could have requested a recommendation letter with a conversation that took place in Armenian, but said, I need this letter for travel. Could you please write it in English? And someone who wrote English could have written it. Well, the mere fact that he was capable of communicating with superiors for the purpose of requesting a recommendation letter, your honor, I think suggests that he was equally capable of communicating with them for the purpose of pointing out, hey, all the things that were supposed to be sent to Party A, there's no there's no record of them ever reaching that that party. I mean, I think he admits he could have told them he just didn't think it was the right strategy. Now, the IJ thought the strategy he chose wouldn't have been the strategy that the IJ chose. But I don't know how we can tell whether that's speculation or whether that's common sense. Well, your honor, I think that you can I think that the you're correct that it's merely an exercise of common sense by the immigration judge, which, of course, he's permitted to make reasonable inferences based on the evidence. Here, I think it was reasonable for the immigration judge to say it makes no sense that you went directly to the authorities based on what would have appeared to you to be just a lack of paperwork as opposed to merely raising the issue with the superior. Finally, the petitioner has also suggested, although I don't know, I believe this was not until after the immigration court hearing had ended that it simply wasn't his responsibility to report these discrepancies, which raises two questions. The first of which is why he would have thought it was his responsibility to go to the authorities, but not his employer. And the second, again, based on his description of his job duties, it very much was his responsibility to point out to someone if the goods from the warehouse weren't being distributed in a reasonable manner. Moving on, we have finally the the issue of the four prior attempts to travel to the United States by a nonimmigrant visa. Now, the government's position is not that a prior attempt to come to the United States standing alone, of course, would support an adverse credibility determination. Here, though, the specific circumstances are such that it is supported. There were four prior attempts, all of them unsuccessful. One of them denied based on the agency's concern that the petitioner would not depart the United States as required and in fact intended to remain there. And one of them denied just two days before the persecution narrative begins. Taken together in a totality of the circumstances, it's understandable for the immigration judge to determine that the prior attempts are problematic. I can see that I have some time left, but you run me to the end of my outline here. Can I ask you, do you agree with your opposing counsel that the alternative holding is not really an alternative holding because it also depends on the credibility determination? To be honest, your honor, I might go even further. The alternative holding says that there's no past harm rising to the level of persecution. The board seems to have said that. But frankly, I do not read the immigration judge's decision as saying it. And that is why the government did not rely on that aspect of the board's decision in its brief. This case should turn on the outcome of credibility alone. There's nothing else I'm prepared to conclude. Thank you, Mr. Tucker. And now, Mr. Saria. Yes, thank you very much. Well, incredibly, Mr. Tucker, as the clerk to give you three minutes on the clock. Mr. Tucker agree now that alternative findings by the board is not an alternative findings in this case should turn on credibility. So we agree on that. I would like to touch on one little thing here. When we filed a brief with the Board of Immigration Appeals, by that time, three years later, after Mr. LaLanne's testimony, there were articles published that the general of the union and member of parliament was arrested for specifically exactly the same activities that my client complained about to the government of Armenia. He could not have predicted it in 2016. What would have happened in 2018 and 19? So we filed specifically Reuters articles and other articles from Freedom House. And that's a page of Mr. Record 042 to show that his testimony three years prior actually matched the reality. And therefore, he is credible. Board turn it on its head and said, well, that article did not specifically mention Mr. LaLanne. And therefore, it does. It's not individualized enough to accept LaLanne's persecution. We were arguing that the article three years later confirming confirming LaLanne's testimony actually shows his credibility. And that's also very important. That's all I have. Thank you, Mr. Sir. Thank you very much. This is a very challenging case and the panel appreciates the excellent advocacy. On both sides of the case. And we also have a special appreciation note to counsel for their willingness to argue remotely in the time of a pandemic. And we appreciate that. So this case shall now be submitted and the parties will hear from us in due course. And then for the clerk, clerk's records, let me say we have one more case on our docket that's also submitted on the briefs. And that's Jang versus Wilkinson. Number 18, 7, 3, 4, 5, 0. This court for this session stands adjourned. Thanks again to counsel.
judges: Wallace, Gould, Friedland